FILED
07/22/2019
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 20, 2019 Session

## CAROLYN COFFMAN ET AL. v. ARMSTRONG INTERNATIONAL, INC. ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 2-485-14     William T. Ailor, Judge**

_____

**No. E2017-01985-COA-R3-CV[1]**
**(Ingersoll-Rand Company)**

_____

**No. E2017-02389-COA-R3-CV**
**(Crane Co.)**

_____

**No. E2017-00062-COA-R3-CV**
**(Fisher Controls Internationals LLC)**

_____

**No. E2017-00063-COA-R3-CV**
**(Flowserve Corporation f/k/a/ Duriron Company)**

_____

**No. E2017-00064-COA-R3-CV**
**(Daniel International Corporation)**

_____

**No. E2017-00065-COA-R3-CV**
**(William Powell Company)**

_____

**No. E2017-00066-COA-R3-CV**
**(Neles-Jamesbury, Inc. and Metso Automation USA Inc.)**

_____

---

[1] The plaintiffs filed separate notices of appeal against twelve defendants. With respect to two of the twelve, the plaintiffs filed a duplicate notice of appeal out of an abundance of caution to correct a possible problem. In any event, there is no dispute as to whether all of the cases are properly before the Court.

**No. E2017-00067-COA-R3-CV**
**(Armstrong International, Inc.)**

_____

**No. E2017-00069-COA-R3-CV**
**(Clark Reliance Company, Jerguson Gage and Valve Division)**

_____

**No. E2017-00071-COA-R3-CV**
**(Ingersoll-Rand Company)**

_____

**No. E2017-00075-COA-R3-CV**
**(Crane Co.)**

_____

**No. E2017-00078-COA-R3-CV**
**(DeZurik, Inc.)**

_____

**No. E2017-00995-COA-R3-CV**
**(John Crane, Inc.)**

_____

This consolidated appeal arises from a product liability action brought by Donald Coffman and his wife, Carolyn Coffman, after Mr. Coffman was diagnosed with mesothelioma. Plaintiffs asserted several claims against multiple defendants for their alleged involvement in Mr. Coffman's exposure to asbestos at his workplace. The trial court dismissed their claims against some of the original defendants. The court granted summary judgment to the remaining defendants. Specifically, the court found that: (1) plaintiffs' claims against one defendant were time-barred by the four-year construction statute of repose set forth in Tenn. Code Ann. § 28-3-202 (2017); (2) plaintiffs' claims against three defendants were time-barred by the ten-year statute of repose set forth in Tenn. Code Ann. § 29-28-103 (2012); (3) ten defendants affirmatively negated their alleged duty to warn; and (4) plaintiffs presented insufficient evidence of causation with respect to seven defendants. The court denied plaintiffs' motion to alter or amend certain summary judgment orders. Plaintiffs filed separate notices of appeal for each final judgment entered by the trial court. These cases were consolidated for the purpose of oral argument before the Court of Appeals. For the reasons stated in this opinion, we vacate all of the final judgments entered by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON, II, J., joined.

H. Douglas Nichol, Knoxville, Tennessee, Donald Capparella, Nashville, Tennessee, and Charles E. Valles, Flower Mound, Texas, for the appellant, Carolyn Coffman, individually and for the benefit of the next of kin of Donald Coffman, Deceased.

James E. Wagner, Knoxville, Tennessee, for the appellee, Ingersoll-Rand Company.

James C. Bradshaw, III, Nashville, Tennessee, and Michael J. Ross and Nicholas P. Vari, Pittsburgh, Pennsylvania, for the appellee, Crane Company.

Hugh B. Bright, Jr. and C. Gavin Shepherd, Knoxville, Tennessee, for the appellee, Fisher Controls International, LLC.

Thomas A. Bickers, John W. Elder, Michael J. King, T. Mitchell Panter, and Adam R. Duggan, Knoxville, Tennessee, for the appellee, Flowserve Corporation f/k/a The Duriron Company, Inc.

Michael J. King, T. Mitchell Panter, and Adam R. Duggan, Knoxville, Tennessee, for the appellee, Daniel International Corporation.

Alan S. Zelkowitz and Scott D. Stephenson, Chicago, Illinois, and Joshua A. Wolfe, Knoxville, Tennessee, for the appellee, The William Powell Company.

Jessalyn H. Zeigler, John W. Dawson, IV, and Sarah B. Miller, Nashville, Tennessee, for the appellees, Neles-Jamesbury, Inc. and Metso Automation USA, Inc.

James A. Beakes, III and B. Hartman Knight, Nashville, Tennessee, for the appellee, Armstrong International, Inc.

Michael J. King, T. Mitchell Panter, and Adam R. Duggan, Knoxville, Tennessee, for the appellee, Clark Reliance Company, Jerguson Gage and Valve Division.

Michael J. King, T. Mitchell Panter, and Adam R. Duggan, Knoxville, Tennessee, for the appellee, DeZurik, Inc.

Kent E. Krause, Nashville, Tennessee, for the appellee, John Crane, Inc.

## OPINION

### I.

"Because summary judgment was awarded to the defendant[s], the following statement of facts is based upon the most favorable view of the record toward[ ] the plaintiff[s], the nonmoving part[ies]." ***Robinson v. Omer***, 952 S.W.2d 423, 424-25 (Tenn. 1997) (citing ***Byrd v. Hall***, 847 S.W.2d 208, 215 (Tenn. 1993)).

Mr. Coffman worked at the Tennessee Eastman chemical plant in Kingsport from 1968 until 1997. For most of his career, Mr. Coffman worked as a mechanic in and around "Building 55," where acid from other divisions was distilled, reclaimed, and refined. Mr. Coffman spent about seventy-five percent of his time in the "tank farm," an outdoor facility adjacent to Building 55 where most of the company's equipment was located.

As a mechanic, Mr. Coffman was responsible for repairing and replacing various pieces of equipment, including pumps, valves, steam traps, and piping. The piping at Eastman carried steam and different types of acids. Because the acids were highly corrosive, it was necessary to repair equipment on a daily basis. Sometimes equipment would have to be entirely replaced.

Plaintiffs claim that Mr. Coffman was exposed to asbestos in three ways. First, plaintiffs claim that Mr. Coffman breathed in dust created by the removal of asbestos-containing insulation manufactured by Johns-Manville Corporation. A vast majority of the equipment in the tank farm was insulated in order to prevent acid from freezing. Mr. Coffman had to remove this insulation in order to reach many of the pumps, valves, and pipes that he routinely repaired and replaced. Steam traps were not insulated, but it was sometimes necessary to remove insulation from a pipe that was adjacent to a steam trap. In order to remove the insulation, Mr. Coffman would use a hammer to "beat it back out of the way" in order to expose bolts and screws. After removing the bolts and screws, he would cut the wires off the insulation and tear it off the equipment. This created a visible dust that Mr. Coffman breathed many times. Mr. Coffman described the insulation as a "gray, whitish chalky material." He said that it did not itch like fiberglass insulation. It is undisputed that Johns-Manville manufactured asbestos-containing insulation.

Mr. Coffman was also constantly in the presence of insulators who were engaged in the removal and installation of insulation in Building 55. Gary Frasier, who worked with Mr. Coffman from 1977 to 1982, testified that the insulation "wasn't yellow fiberglass." According to Mr. Frasier, there was a crew of two or three insulators in Building 55 every day. These insulators worked for independent contractors, including Daniel International Corporation (Daniel). The insulators did not rope off work areas or utilize plastic barriers until the mid-1980s. Their removal and installation of insulation

created a visible dust that Mr. Coffman breathed on numerous occasions.

Second, plaintiffs claim that Mr. Coffman breathed in dust created by the removal of asbestos-containing gaskets manufactured by Flexitallic, Garlock, and Johns-Manville. Gaskets are sealing mechanisms that are incorporated into equipment in order to prevent leaks. "Flange" gaskets are located between the external flanges of a piece of equipment and the pipe to which the equipment is connected; they are typically applied by the purchaser post-sale. "Bonnet" gaskets are located inside various pieces of equipment; an equipment manufacturer typically incorporates internal bonnet gaskets into the equipment pre-sale. According to Mr. Coffman, it was sometimes necessary to remove gaskets in order to repair a piece of equipment. Other times, gaskets had to be replaced because they were deteriorating and causing leaks. Normally, gaskets came off in pieces; parts of the gasket would stick to the metal equipment and had to be scraped off so that the residual gasket material would not cause future leaks. Mr. Coffman used a putty knife, a wire brush, or a "sheep nose" device to scrape off the residual gasket material. All three scraping methods created a visible dust that Mr. Coffman breathed many times.

Third, plaintiffs claim that Mr. Coffman breathed in dust created by the removal of asbestos-containing packing manufactured by John Crane, Inc. (John Crane), A.W. Chesterton, Garlock, and Johns-Manville. Packing is a braided material that serves as a sealant. It is wrapped around the interior stem of valves. It is also used to hold fluids and steam inside pumps. According to Mr. Coffman, packing had to be replaced "constantly" because it "would be burnt up from being tightened too tight" or was "just wore plum out." This caused equipment to leak. Mr. Coffman used a "packing hook" to pull packing out of the packing gland of a pump. Packing would break into pieces during this process. When this happened, Mr. Coffman would continue using the packing hook to scrape the remaining packing out of the equipment. This created a visible dust that Mr. Coffman breathed many times. Mr. Coffman testified that none of the aforementioned equipment contained labels warning him about the dangers of asbestos exposure.

After Mr. Coffman was diagnosed with mesothelioma, plaintiffs filed their complaint. Instead of suing the manufacturers of the asbestos-containing insulation and gaskets[2], plaintiffs sued: Daniel, an independent contractor whose insulators removed

---

[2] Johns-Manville filed for bankruptcy in the 1980s. During the bankruptcy proceedings, the Manville Personal Injury Settlement Trust was created. Pursuant to a federal court order, "the Trust shall be treated in litigation between Beneficiaries of the Trust as a legally responsible tortfeasor under applicable law, without the introduction of further proof." *In re Joint E. and S. Dist. Asbestos Litigation*, 878 F. Supp. 473, 591 (S.D.N.Y. 1995), *aff'd in part, rev'd in part*, 78 F.3d 764 (2d Cir. 1996), *on remand*, 929 F. Supp. 1 (E. & S.D.N.Y. 1996), *aff'd without op.*, 100 F.3d 944 (2d Cir. 1996) and 100 F.3d 945 (2d Cir. 1996). Plaintiffs filed a claim with the Trust and received payment for their claim. The trial court ruled that if this case proceeds to trial, the jury will be instructed to "make an allocation of fault to Johns-Manville with regard to the insulation and other asbestos-containing materials that Johns-Manville manufactured and supplied to Tennessee Eastman."

and installed asbestos-containing insulation at Eastman; John Crane, a manufacturer of asbestos-containing packing; and several manufacturers of industrial equipment: Armstrong International, Inc. (Armstrong) (steam traps), Crane Company (valves), DeZurik, Inc. (DeZurik) (valves), Flowserve Corporation f/k/a The Duriron Company, Inc. (Flowserve) (pumps and valves), Fisher Controls International, LLC (Fisher) (valves), Ingersoll-Rand Company (Ingersoll-Rand) (pumps), Neles-Jamesbury, Inc. and its subsidiary Metso Automation USA, Inc. (collectively, Jamesbury) (valves), Clark Reliance Company, Jerguson Gage and Valve Division (Jerguson) (valves), and The William Powell Company (Powell) (valves) (collectively, equipment defendants).[3] These equipment defendants purchased asbestos-containing gaskets and/or packing from other manufacturers and incorporated those asbestos components into some of their equipment pre-sale. They also sold asbestos-containing replacement gaskets and/or packing manufactured by others.

All of the defendants filed motions for summary judgment. As an affirmative defense, Daniel argued that plaintiffs' claims were time-barred by the four-year construction statute of repose set forth in Tenn. Code Ann. § 28-3-202. Several other defendants argued that plaintiffs' claims were time-barred by the ten-year statute of repose set forth in Tenn. Code Ann. § 29-28-103. Additionally, the equipment defendants argued that they had affirmatively negated their alleged duty to warn. Several defendants also argued that plaintiffs' evidence was insufficient to establish causation.

The trial court held two hearings on the defendants' motions for summary judgment. The court also held a third hearing to consider various motions to alter or amend. Ultimately, the court granted summary judgment to the defendants on all claims asserted against them. The court ruled that: (1) plaintiffs' claims against Daniel were time-barred by the four-year construction statute of repose; (2) plaintiffs' claims against Crane Company, Ingersoll-Rand, and Jamesbury were time-barred by the ten-year statute of repose; (3) the equipment defendants were entitled to summary judgment because they affirmatively negated their alleged duty to warn, which the court determined was an essential element of plaintiffs' negligence and strict liability claims; and (4) seven defendants – Armstrong, Crane Company, DeZurik, Fisher, Jamesbury, Jerguson, and John Crane – were entitled to summary judgment because plaintiffs presented insufficient evidence of causation, which the court determined was an essential element of plaintiffs' negligence and strict liability claims.

As the trial court noted in some of its orders, plaintiffs' other claims failed because they are dependent on an initial finding of tortious conduct. *See **Williams v. U.S.***, 754 F. Supp. 2d 942, 955 (W.D. Tenn. 2010) (citations omitted) ("A spouse seeking recovery for loss of consortium cannot recover unless the defendant has been held liable to the injured spouse."); ***Lynn v. City of Jackson***, 63 S.W.3d 332, 335 (Tenn. 2001) ("[T]he Tennessee

---

[3] There are many references in this opinion to "equipment defendants."

wrongful death statute preserves the action the decedent would have had, rather than creating a new cause of action in the surviving beneficiaries[.]”); **Levy v. Franks**, 159 S.W.3d 66, 82 (Tenn. Ct. App. 2004) (“In contrast [to criminal conspiracy], there is no liability under a theory of civil conspiracy unless there is underlying wrongful conduct.”); **Leatherwood v. Wadley**, 121 S.W.3d 682, 693-94 (Tenn. Ct. App. 2003) (quoting **Menuskin v. Williams**, 145 F.3d 755, 766 (6th Cir. 1998)) (“To prevail on a claim of gross negligence in Tennessee, a plaintiff must [first] demonstrate ordinary negligence[.]”). The court determined that plaintiffs’ negligence per se claims failed due to insufficient evidence of causation. *See* **Rains v. Bend of the River**, 124 S.W.3d 580, 590 (Tenn. Ct. App. 2003) (citations omitted).

Plaintiffs appealed from the orders that the trial court certified as final pursuant to Tenn. R. Civ. P. 54.02. This Court consolidated those cases pursuant to Tenn. R. App. P. 16(b). We also consolidated plaintiffs’ appeal of the order granting summary judgment to John Crane. Although the trial court did not certify that order as final pursuant to Tenn. R. Civ. P. 54.02, the order was a final judgment at the time this Court consolidated plaintiffs’ appeal because “all the claims or the rights and liabilities of . . . all the parties” had been resolved. *See* Tenn. R. Civ. P. 54.02.

## II.

We restate and consolidate the issues raised by plaintiffs as follows:

Whether the trial court’s verbatim adoption of the equipment defendants’ proposed findings of fact and conclusions of law violated Tenn. R. Civ. P. 56.04, as interpreted in **Smith v. UHS of Lakeside, Inc.**, 439 S.W.3d 303 (Tenn. 2014).

Whether the trial court erred by granting summary judgment to Daniel on the basis of the four-year construction statute of repose set forth in Tenn. Code Ann. § 28-3-202.

Whether the trial court erred by granting summary judgment to Crane Company, Ingersoll-Rand, and Jamesbury on the basis of the ten-year statute of repose set forth in Tenn. Code Ann. § 29-28-103.

Whether the trial court erred by granting summary judgment to the equipment defendants on the ground that they affirmatively negated their alleged duty to warn.

Whether the trial court erred by granting summary judgment to Armstrong, Crane Company, DeZurik, Fisher, Jamesbury,

*Jerguson*, and John Crane on the ground that plaintiffs presented insufficient evidence of causation.

## III.

Plaintiffs first ask us to consider whether the trial court's verbatim adoption of the equipment defendants' proposed findings of fact and conclusions of law violated Tenn. R. Civ. P. 56.04, as interpreted in **Smith v. UHS of Lakeside, Inc.**, 439 S.W.3d 303 (Tenn. 2014) (hereinafter "**Lakeside**"). Plaintiffs did not raise this issue with respect to the court's orders granting summary judgment to Daniel and John Crane. Accordingly, we confine our analysis to the court's orders granting summary judgment to the equipment defendants.

Tenn. R. Civ. P. 56.04 provides that "[t]he trial court shall state the legal grounds upon which the court denies or grants the motion [for summary judgment], which shall be included in the order reflecting the court's ruling." In **Lakeside**, the Supreme Court clarified the application of this rule in the context of party-prepared summary judgment orders:

> [W]e do not find that Tenn. R. Civ. P. 56.04 is in any way inconsistent with the custom of permitting trial courts to request and consider proposed orders prepared by the prevailing party. However, as we emphasized in the context of the findings of fact and conclusions of law required by Tenn. R. Civ. P. 52.01, Tenn. R. Civ. P. 56.04 must be interpreted in a way that assures that a trial court's decision whether to grant or deny a motion for summary judgment is its own. **Delevan–Delta Corp. v. Roberts**, 611 S.W.2d at 53….
>
> [W]e conclude that *Tenn. R. Civ. P. 56.04 requires the trial court*, upon granting or denying a motion for summary judgment, *to state the grounds for its decision before it invites or requests the prevailing party to draft a proposed order*. Not only will this requirement assure that the decision is the trial court's, it will also (1) assure the parties that the trial court independently considered their arguments, (2) enable the reviewing courts to ascertain the basis for the trial court's decision, and (3) promote independent, logical decision-making. *See* **DiLeo v. Ernst & Young**, 901 F.2d 624, 626 (7th Cir.1990); **State v. King**, 432 S.W.3d 316, 322 (Tenn. 2014).

439 S.W.3d at 316 (footnotes omitted).[4] Ultimately, the Supreme Court affirmed the decision of the Court of Appeals, which vacated the trial court's order granting summary judgment to the defendant. *Id.* at 318.

This Court has repeatedly vacated trial court orders that fail to comply with Tenn. R. Civ. P. 56.04, as interpreted in *Lakeside*. *E.g.*, *Mitchell v. Mitchell*, No. E2017-00100-COA-R3-CV, 2019 WL 81594, at *7 (Tenn. Ct. App., filed Jan. 3, 2019) (vacating the trial court's order because it was unclear whether the court's order reflected the court's independent judgment); *Potter's Shopping Ctr., Inc. v. Szekely*, 461 S.W.3d 68, 72 (Tenn. Ct. App. 2014) (vacating the trial court's order because it failed to state the legal grounds for the court's decision).

However, this Court has also held that a violation of Tenn. R. Civ. P. 56.04 is not reversible error *under all circumstances*. *Huggins v. McKee*, 500 S.W.3d 360, 366-67 (Tenn. Ct. App. 2016), *perm. app. denied* (Tenn. Sept. 22, 2016). In *Huggins*, the trial court violated Tenn. R. Civ. P. 56.04 because the court adopted party-prepared findings of fact and conclusions of law without first stating the legal grounds for the court's decision. *Id.* This called into question whether the court exercised its independent judgment. Nevertheless, "[i]n the interest of providing the parties to th[at] case a final resolution of the issues," we chose to "exercise our discretion to proceed to consider the merits of th[e] appeal[.]" *Id.* at 366; *see also* Tenn. R. Civ. P. 1 ("These rules shall be construed to secure the just, speedy, and inexpensive determination of every action.").

In the present case, we exercise our discretion to address the merits of this appeal instead of evaluating the trial court's alleged *Lakeside* violations and potentially remanding for the entry of additional summary judgment orders. Although we are mindful of "the fundamental importance of assuring that a trial court's decision . . . is the product of the trial court's independent judgment," *Lakeside*, 439 S.W.3d at 314, we have determined that any potential violations of Tenn. R. Civ. P. 56.04 are moot. For the reasons discussed in this opinion, the trial court erred by granting the equipment defendants summary judgment on the grounds stated in the orders ultimately entered by the trial court. Consequently, the *Lakeside* issue is pretermitted. We caution litigants and trial courts that we may not choose to overlook potential violations of Tenn. R. Civ. P. 56.04 in the future. *See Huggins*, 500 S.W.3d at 366-67.

## IV.

The remaining issues require us to determine whether the trial court erred by

---

[4] A trial court also violates Tenn. R. Civ. P. 56.04 when the court's order fails to "state the legal grounds" for the court's decision. *See, e.g.*, *Smith v. UHS of Lakeside, Inc.*, No. W2011–02405–COA–R3–CV2013 WL 210250, at *6 (Tenn. Ct. App., filed Jan. 18, 2013), aff'd, 439 S.W.3d 303 (Tenn. 2014) (distinguishing between "order[s] entered [that] contain[ ] no legal grounds for the ruling" and "order[s] [that] do not accurately reflect the trial court's oral rulings[.]").

granting summary judgment to the defendants. "A trial court's grant of a motion for summary judgment presents a question of law" that we review de novo. *Eadie v. Complete Co., Inc.*, 142 S.W.3d 288, 291 (Tenn. 2004) (citing *Goodloe v. State*, 36 S.W.3d 62, 65 (Tenn. 2001)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The Supreme Court has ruled that

> when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.

*Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015) (emphasis in original). On the other hand, if the moving party is asserting an affirmative defense, and therefore has the burden of proof at trial, the moving party must "alleg[e] undisputed facts that show the existence of the affirmative defense." *Id.* at 259 (quoting *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8-9 & n.6 (Tenn. 2008)).[5]

Once the moving party has satisfied its burden of production, in order to survive summary judgment, the non-moving party

> may not rest upon the mere allegations or denials of the adverse party's pleading, but his or her response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Tenn. R. Civ. P. 56.06. This may be accomplished by:

> (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit

---

[5] *Rye* overruled *Hannan*, but only as to "cases where the moving party who does not bear the burden of proof at trial files the motion [for summary judgment]." *Cardinal Health 108, Inc. v. East Tennessee Hematology-Oncology Associates, P.C.*, No. E2015–00002–COA–R3–CV, 2016 WL 158090, at *2 n.1 (Tenn. Ct. App., filed Jan. 14, 2016).

explaining the necessity for further discovery pursuant to
Tenn. R. Civ. P., Rule 56.06.

***Martin v. Norfolk S. Ry. Co.***, 271 S.W.3d 76, 84 (Tenn. 2008) (quoting ***McCarley v. W. Quality Food Serv.***, 960 S.W.2d 585, 588 (Tenn. 1998)).

## A.

We will first consider whether the trial court erred by granting summary judgment to Daniel on the basis of the four-year construction statute of repose. Because the construction statute of repose is an affirmative defense, Daniel had the burden of "alleging undisputed facts that show the existence of the affirmative defense." ***Rye***, 477 S.W.3d at 259.

Tennessee's construction statute of repose provides that

> [a]ll actions to recover damages for any deficiency in the design, planning, supervision, observation of construction, or construction of an improvement to real property . . . for injury to the person or for wrongful death arising out of any such deficiency, shall be brought . . . within four (4) years after substantial completion of such an improvement.

Tenn. Code Ann. § 28-3-202. This statute is subject to the following exception:

> The [construction statute of repose] shall not be asserted as a defense by any person in actual possession or the control, as owner, tenant, or otherwise, of such an improvement at the time any deficiency in such an improvement constitutes the proximate cause of the injury or death for which it is proposed to bring an action.

Tenn. Code Ann. § 28-3-205(a).

Daniel was an independent contractor hired to perform construction services at Eastman. One of the services Daniel provided was the periodic removal and installation of insulation. Plaintiffs claim that Mr. Coffman was exposed to asbestos as a result of this activity. In the trial court, Daniel contended that its removal and installation of insulation constituted "construction of an improvement to real property" within the meaning of the construction statute of repose. Daniel also submitted evidence that it ceased providing construction services in 1990. According to Daniel, plaintiffs' claims were clearly time-barred.

- 11 -

For purposes of summary judgment, plaintiffs did not dispute that Daniel completed its construction work in 1990. However, plaintiffs insisted that Daniel's daily removal and installation of insulation was not "construction of an improvement to real property." Alternatively, plaintiffs argued that the exception to the construction statute of repose was applicable.

The trial court ruled that the statute of repose barred plaintiffs' claims because Daniel's removal and installation of insulation was "construction of an improvement to real property." That determination is a question of law that we review de novo. *Memphis Light, Gas & Water Div. v. T.L. James & Co. Inc.*, No. 52, 1986 WL 11588, at \*4 (Tenn. Ct. App., filed Oct. 17, 1986).

Tennessee's construction statute of repose does not define the term "improvement to real property." In the absence of a statutory definition, "the words of the statute are to be given their usual and ordinary meaning, without forced limitations or extensions." *Id.* at \*3 (citing *State v. Thomas*, 635 S.W.2d 114 (Tenn. 1982)). Applying that interpretive principle, we have previously held that the word "improvement" in the construction statute of repose means

> [a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its value, beauty or utility or to adapt it for new or further purposes. Generally, buildings, but may also include any permanent structure or other development, such as a street, sidewalks, sewers, utilities, etc.

*Id.* (citing Black's Law Dictionary, 5th Ed. (1979)).

Plaintiffs correctly observe that Tennessee law recognizes a distinction between "improvements to real property" and "mere repairs or replacement." *See id.; see also Cartwright v. Presley*, No. E2005-02418-COA-R3CV, 2007 WL 161042, at \*4-5 (Tenn. Ct. App., filed Jan. 23, 2007). However, the parties have not cited, and we have not identified, any Tennessee cases which have addressed the specific question of whether the daily removal and installation of insulation at an industrial facility is "construction of an improvement to real property."[6]

---

[6] The cases cited by Daniel are factually distinguishable. We also note that Daniel relies on *Hayes v. Cooperstown's Mastersweep, Inc.*, No. W2014-00783-COA-R3-CV, 2015 WL 3487076 (Tenn. Ct. App., filed Feb. 24, 2015), *perm. app. denied, not for citation* (Tenn. 2015). Cases designated "not for citation" have no precedential value and may not be cited by the parties or the courts. Tenn. Sup. Ct. R. 4(E). Accordingly, we ignore the *Hayes* case.

- 12 -

In ***Peter v. Sprinkmann Sons Corporation***, the Wisconsin Court of Appeals held that a contractor's daily removal and installation of asbestos-containing insulation at an industrial facility was *not* "construction of, or the furnishing of materials for, the improvement to real property" under Wisconsin's construction statute of repose. 860 N.W.2d 308, 311-12, 315 (Wis. Ct. App. 2015). The court reasoned that the "initial" installation of insulation might be considered construction of an improvement to real property, but the daily removal and installation of insulation indicates that the insulation is merely being repaired or replaced. *See id.* at 315. In other cases, courts have held that a defendant is not entitled to summary judgment pursuant to a construction statute of repose when there is an issue of fact as to whether insulation is intended to be a permanent feature of a building. *See, e.g.*, ***Estate of Brandes v. Brand Insulations, Inc.***, No. 73748–1–I, 2017 WL 325702, at *3 (Wash. Ct. App., filed Jan. 23, 2017); ***Sorenson v. Building Service Indus. Sales, Inc.***, No. 2014AP964, 2015 WL 1893444, at *4 (Wis. Ct. App., filed Apr. 28, 2015); ***Covington v. W.R. Grace-Conn., Inc.***, 952 P.2d 1105, 1108 (Wyo. 1998).

Like the Wisconsin Court of Appeals, "[w]e agree that the *initial* installation of insulation into a building or house *may* be considered an improvement to real property," if it is intended to be a permanent feature of the property. ***Peter***, 860 N.W.2d at 315 (emphasis added); *see also* ***Pridemark Custom Plating, Inc. v. Upjohn Co., Inc.***, 702 S.W.2d 566 (Tenn. Ct. App. 1985) (assuming that spray-on insulation material that was applied during the original construction of a building constituted an "improvement to real property"). However, the daily removal and installation of insulation at an industrial facility over the course of many years indicates that existing insulation is merely being repaired and replaced. *See* ***Peter***, 860 N.W.2d at 315. We hold, as a matter of law, that such activity does not constitute "construction of an improvement to real property" within the meaning of Tenn. Code Ann. § 28-3-202.

Accordingly, the trial court erred when it granted summary judgment to Daniel on the basis of the construction statute of repose.

**B.**

We next consider whether the trial court erred by granting summary judgment to Crane Company, Ingersoll-Rand, and Jamesbury on the basis of the ten-year statute of repose set forth in Tenn. Code Ann. § 29-28-103.

At the outset, we acknowledge that DeZurik, Fisher, Flowserve, Jerguson, and Powell claim that the trial court also granted them summary judgment pursuant to the ten-year statute of repose. We disagree. The court only granted Flowserve "partial summary judgment" on the repose issue. Specifically, the court ruled that the statute of repose barred claims as to "pumps or valves *first sold for use prior to July 1, 1969*." (Emphasis added.) The trial court *denied* Flowserve's motion for summary judgment "[w]ith regard

- 13 -

to any pumps that were replaced," because there was an issue of material fact as to whether Flowserve sold products to Eastman *on or after July 1, 1969.* Similarly, the court ruled that "Powell is not liable . . . for any valves *first sold for use prior to July 1, 1969.*" (Emphasis added.)

The orders granting summary judgment to DeZurik, Fisher, and Jerguson say *nothing* about the statute of repose. Nevertheless, defendants argue that the trial court granted them summary judgment on the repose issue because the court's orders incorporate by reference the findings of fact and conclusions of law that accompanied Crane Company's summary judgment order (which did include a discussion of the statute of repose). Those findings and conclusions, however, are only specific to Crane Company. In some cases, the same findings of fact and conclusions of law might be applicable to more than one party; however, determining whether the statute of repose bars a product liability action is a fact-intensive and defendant-specific inquiry. In this context, the incorporation of findings and conclusions that are specific to a different defendant is meaningless absent additional clarification. The trial court did not provide such clarification in its orders granting summary judgment to DeZurik, Fisher, and Jerguson.[7] Regardless of the trial court's alleged intentions, we hold that the court's orders did not grant summary judgment to these defendants on the repose issue.

In 1978, the General Assembly enacted the Tennessee Products Liability Act (TPLA), which included the following statute of repose:

> [a]ny action against a manufacturer or seller of a product for injury to person or property caused by its defective or unreasonably dangerous condition . . . *must be brought within ten (10) years from the date on which the product was first purchased for use or consumption . . . .*

Tenn. Code Ann. § 29-28-103(a) (emphasis added) (effective July 1, 1978). One year later, the legislature amended the TPLA by adding the following exception to the statute of repose:

> The foregoing limitation of actions shall not apply to any action resulting from exposure to asbestos . . . .

*Id.* at § 103(b) (effective July 1, 1979).

---

[7] In contrast, the court's order granting summary judgment to Jamesbury incorporates paragraphs 11-55 from Crane Company's conclusions of law on the repose issue *and makes additional findings of fact that are specific to Jamesbury.*

- 14 -

In ***Wyatt v. A-Best Products Company***, this Court clarified that the asbestos exception of 1979 cannot be applied retroactively to resurrect claims that were previously extinguished by the 1978 statute of repose. 924 S.W.2d 98, 104 (Tenn. Ct. App. 1995), *pet. to rehear granted in part and denied in part, perm. app. denied* (Tenn. 1996). Therefore, in asbestos-exposure cases, the statute of repose continues to shield defendants from liability with respect to products "first purchased for use or consumption" *prior to* July 1, 1969 (ten years prior to the effective date of the 1979 asbestos exception); however, the statute of repose does *not* shield defendants from liability with respect to products "first purchased for use or consumption" *on or after* July 1, 1969.

Before we consider the trial court's rulings with respect to each defendant, we pause to address two common concerns. First, the parties disagree about the type of evidence defendants must produce in order to successfully "alleg[e] undisputed facts that show the existence of the affirmative defense." ***Rye***, 477 S.W.3d at 259. Plaintiffs argue that the only way defendants can shift the burden of proof is by submitting evidence that the defendants stopped selling and/or manufacturing all allegedly defective products before July 1, 1969. Plaintiffs' argument is based on a flawed interpretation of this Court's order on the petition for rehearing in ***Wyatt***. Although we did hold that one of the defendants in ***Wyatt*** was entitled to summary judgment because that defendant stopped manufacturing asbestos-containing products prior to July 1, 1969, we never stated that producing such evidence is the *only* way a defendant can show the applicability of the statute of repose. *See* ***Wyatt***, 924 S.W.2d at 108.

Second, plaintiffs argue that the trial court erred when it disregarded certain statements made by Mr. Coffman during his deposition. Plaintiffs' counsel repeatedly asked Mr. Coffman whether he breathed insulation dust, packing dust, and gasket dust as a result of working on defendants' valves and pumps "that were installed at the facility after 1970." In response to these questions, Mr. Coffman said, "Yes, sir." The trial court determined that this testimony was inadmissible because it was elicited by questions that "were objectionable because of their leading and compound nature."

"A decision whether to admit or exclude evidence lies within the discretion of the trial court." ***In re Estate of Schisler***, 316 S.W.3d 599, 606 (Tenn. Ct. App. 2009) (citations omitted). "A trial court abuses its discretion only when it 'applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to the party complaining.' " *Id.* (quoting ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001)).

We disagree with the trial court that plaintiffs' counsel asked leading questions. Although the questions called for a "yes" or "no" response, they did not "suggest[ ] the specific answer desired." *See* ***Smith v. Walker***, No. M2012–00593–COA–R3–CV, 2012 WL 4167167, at *3 (Tenn. Ct. App., filed Sept. 19, 2012) (citations omitted). However, the trial court correctly concluded that the questions were "compound in nature."

- 15 -

Plaintiffs' counsel was essentially asking two questions: (1) Did you breathe dust as a result of working on defendants' equipment? and (2) Was that equipment installed after 1970? In concluding that these questions were compound in nature, the court did *not* apply an incorrect legal standard. Nor did the court reach a decision that is illogical, unreasonable, or that caused an injustice to plaintiffs. Accordingly, the trial court did not abuse its discretion in disregarding the testimony.

**1.**

With respect to Crane Company, the trial court determined that "there is no evidence in the record that Crane Co. sold any injurious products to the Eastman facility on or after July 1, 1969." According to the court,

> 36. In the instant action, Defendant Crane Co. has sustained its burden of proof of this affirmative defense by citing Mr. Coffman's own testimony, in which he admitted that the Crane Co. valves he worked with "were there when I first got there [in 1968], and I'm sure they're still there." *See* Finding of Fact #19.
>
> 37. Upon further questioning, Mr. Coffman again confirmed this fact.
>
> **Q:** These valves were pre-1968 valves? In other words, they were there before you started working there?
>
> **A:** Yes, sir.

This testimony was the only evidence cited by Crane Company to support its position that all Crane Company valves at Eastman were sold prior to July 1, 1969. Upon closer examination, however, the testimony upon which Crane Company relies does not "show the existence of the affirmative defense." *Rye*, 477 S.W.3d at 259.

In context, Mr. Coffman testified as follows:

> Q. Do you have any recollection, and if you don't, that's fine. Do you have any recollection as to the type of Crane Co. valves you were working on? Were they globe valves, gate valves?
>
> **A. They were various. It depended. I know they used -- they liked to use globe valves on the condensate side. And they liked to use gate valves on the rest of them.**

- 16 -

[A discussion about globe valves ensued.]

\* \* \*

Q. And *gate valves* were used where?

**A. Throughout the building. They were there when I first got there, and I'm sure they're still there.**

Q. For any single purpose or for multiple purposes?

**A. Multiple purposes.**

Q. Okay. So you can't tell me for -- for a Crane Co. *gate valve*, you can't tell me if it was attached to a cold system or a hot system or a low pressure system or a high pressure system?

**A. No, sir, I couldn't.**

Q. They could have been attached to all of the above?

**A. Yes, sir.**

Q. Okay. These valves were pre-1968 valves? In other words, they were there before you started working there?

**A. Yes, sir.**

(Bold in original.)

Mr. Coffman was clearly referring to Crane Company *gate valves* when he said, "[t]hey were there when I first got there, and I'm sure they're still there." Moments later, Mr. Coffman was asked whether "[t]hese valves were pre-1968 valves." It is unclear whether "[t]hese valves" refers to gate valves or all Crane Company valves. A jury could reasonably infer that Mr. Coffman understood "[t]hese valves" to mean gate valves and not all Crane Company valves. Mr. Coffman's response to this ambiguous question is not sufficient to sustain Crane Company's burden of identifying undisputed facts that show the existence of the statute of repose defense.

- 17 -

Even though we conclude that Crane Company never shifted the burden to plaintiffs, we note that there is evidence in the record that raises a question of fact on this issue. For example, shortly before Mr. Coffman was asked about Crane Company valves, the following exchange took place:

> Q. Okay. All of those buildings, all six of them, were in existence when you started working there in August of 1968, correct?
>
> **A. Yes, sir.**
>
> Q. And all of the valves within those buildings were in place at the time that you -- that you started working in August of '68, *unless you would remove them and replace them*, right?
>
> **A. Yes, sir.**

(Bold in original.)

Mr. Coffman repeatedly testified that he replaced various pieces of equipment, including Crane Company valves. In fact, Mr. Coffman testified that he replaced Crane Company valves more often than he repaired them. When asked whether Crane Company valves were ever replaced with valves made by a different manufacturer, Mr. Coffman said, "Some – At some point, I'm sure that's happened." From this testimony, a jury could reasonably conclude that some – and perhaps most – Crane Company valves were replaced with identical Crane Company valves rather than valves produced by a different manufacturer. A jury could also reasonably infer that replacement valves that were *installed* after July 1, 1969 were also *purchased* on or after July 1, 1969.

The affidavit signed by Mr. Frasier's could also lead a jury to reasonably infer that Eastman purchased Crane Company valves on or after July 1, 1969. In his affidavit, Mr. Frasier testified:

> While I was at Eastman, it was common knowledge and my understanding that there was a plant-wide program to keep on hand as little inventory for equipment as possible because Eastman was required to pay some type of tax on inventory which it owned. Also during my time at Eastman, it was common knowledge and my understanding that equipment was acquired on consignment so that it would be on-site and quickly available if needed, but Eastman would not actually take ownership of the equipment until immediately before it

- 18 -

was put into service.[8]

The trial court ruled that Mr. Frasier's testimony created an issue of fact as to whether some defendants (e.g., Fisher) sold equipment to Eastman after July 1, 1969. The court reasoned that if Eastman kept little inventory on-site and acquired equipment on consignment, a jury could reasonably conclude that Eastman purchased additional equipment when the need arose. Although the court's order granting summary judgment to Crane Company does not mention Mr. Frasier's affidavit, Mr. Frasier's testimony is equally applicable to Crane Company.

Finally, plaintiffs argue that Crane Company failed to carry its burden of submitting evidence that it did not sell *replacement parts* (i.e., insulation, gaskets, and packing) to Eastman on or after July 1, 1969. Crane Company has admitted that it

> offered for sale certain products manufactured by other companies. A small quantity of those products may have contained asbestos. Among other products, Crane Co. offered for sale gaskets, packing, and discs manufactured by other companies that may have contained asbestos.

Crane Company argued, and the trial court held, that there was no evidence that Crane Company sold these replacement parts to Eastman on or after July 1, 1969. This approach, however, ignores Crane Company's burden to submit evidence showing that it did *not* sell replacement parts to Eastman on or after July 1, 1969.[9] We agree with plaintiffs that, in this context, "absence of evidence is not evidence of absence."

Because there are questions of fact as to whether Crane Company sold asbestos-containing valves and replacement parts to Eastman on or after July 1, 1969, we hold that Crane Company failed to carry its burden of identifying undisputed facts that establish the statute of repose defense. The trial court erred in concluding otherwise.

**2.**

With respect to Jamesbury, the trial court made the following findings of fact relative to the statute of repose issue:

> 23. All of the buildings Mr. Coffman worked in were

---

[8] Neither Crane Company, Ingersoll-Rand, nor Jamesbury objected to the admissibility of Mr. Frasier's testimony in the trial court. This results in waiver of the issue on appeal. *See* Tenn. R. App. P. 36(a).

[9] Under the TPLA, a non-manufacturing seller of defective or unreasonably dangerous products can be liable if the conditions set forth in Tenn. Code Ann. § 29-28-106 are satisfied.

constructed before August of 1968. *See* Coffman Dep. Vol. 2 (*Exh. C*) at 16.

24. Mr. Coffman testified that he never installed any Jamesbury valves. (Coffman Dep. 175:19-21 and 180:16-21, Nov. 19, 2014.)

25. Mr. Coffman testified that all of the Jamesbury valves that he recalled were already in place when he started at Eastman. (Coffman Dep. 175:14-16). When he repaired a valve he alleged was a Jamesbury valve he did not know whether the packing was original to the valve. (Coffman Dep. 180:25 – 181:4.)

Based on these findings, the court concluded that Jamesbury carried its burden of identifying undisputed facts that establish the statute of repose defense.

Once again, the trial court's findings of fact do not provide a complete picture. Mr. Coffman did testify that Jamesbury valves were already present at Eastman when he started working there. He also testified that he never installed a new Jamesbury valve. However, Mr. Coffman also testified as follows:

Q. Do you recall seeing any Jamesbury valves after the 1970s?

**A. Well, yes, there was still some in the building, but they were being replaced as it came time to replace them or, you know, they mechanically failed or something and we would have to start replacing valves.**

Q. When a Jamesbury valve needed to be replaced, was it replaced with another Jamesbury valve or a different manufacturer?

**A. It was usually a different one.**

\* \* \*

Q. -- is your testimony the same regarding that when a Jamesbury valve needed to be replaced, it was replaced by a valve with another manufacturer?

- 20 -

**A. Not 100 percent. It would depend on the foreman. If the valve was giving no problem and he just wanted it packed, it wouldn't be replaced.**

Q. But when it was replaced, regardless of which building you were working in, you never installed a new Jamesbury valve; is that – is that true?

**A. I didn't, but others did because I've seen them.**

(Bold in original.)

Mr. Coffman's testimony that he remembered seeing others install new Jamesbury valves, in combination with Mr. Frasier's affidavit, raises an issue of fact as to whether Eastman purchased new Jamesbury valves on or after July 1, 1969.

Plaintiffs also argue that Jamesbury failed to carry its burden of showing that it did not sell replacement parts to Eastman after July 1, 1969. A Jamesbury representative testified that Jamesbury never sold replacement insulation or flange gaskets. Jamesbury did sell replacement bonnet gaskets and packing repair kits, but Mr. Coffman testified that he never used a Jamesbury packing repair kit. In our view, Jamesbury successfully shifted the burden to plaintiffs with respect to replacement insulation, flange gaskets, and packing sold by Jamesbury. However, because Jamesbury failed to carry its burden of showing that it did not sell asbestos-containing valves and internal replacement gaskets to Eastman on or after July 1, 1969, the trial court erred in granting summary judgment to Jamesbury on the basis of the statute of repose.

**3.**

The trial court's order granting summary judgment to Ingersoll-Rand pursuant to the statute of repose simply states, "the Court finds that the movant has negated the Plaintiff's claims by showing that any exposure to this Defendant's products involved products which had been purchased for use prior to July 1, 1969." The order did not contain findings of fact to support the court's legal conclusion.

Ingersoll-Rand produced documentation showing that it sold products to Eastman as late as 1966. Notably, however, Ingersoll-Rand failed to submit any evidence that it *ceased* selling products to Eastman in 1966. Ingersoll-Rand also cited Mr. Coffman's testimony that there were Ingersoll-Rand pumps in the tank farm at the time he started working at Eastman. According to Mr. Coffman, however, "many" of the pumps in the tank farm were replaced. Mr. Coffman stated that he personally installed one new Ingersoll-Rand pump in the early 1970s. Mr. Coffman's testimony, in combination with

- 21 -

Mr. Frasier's affidavit, raises a question of fact as to whether Eastman purchased at least one Ingersoll-Rand pump (and perhaps others) on or after July 1, 1969. Accordingly, the trial court erred in granting summary judgment to Ingersoll-Rand on the basis of the statute of repose.

## C.

The trial court granted summary judgment to the equipment defendants after finding that they affirmatively negated their alleged duty to warn, which the court determined was an essential element of plaintiffs' negligence and strict liability claims.[10] The equipment defendants concede that this ground for summary judgment only applies to plaintiffs' claims arising from the post-sale integration of asbestos-containing insulation, flange gaskets, replacement internal gaskets, and replacement packing manufactured and sold by others. The equipment defendants do *not* argue that they negated their alleged duty to warn about asbestos-containing gaskets and packing incorporated into their equipment pre-sale or sold separately by defendants as replacement parts.[11] As stated in DeZurik's brief,

> None of the defendants have argued that the TPLA precludes liability for asbestos-containing products that were included with their equipment at the time of sale. On the contrary, the equipment defendants have consistently acknowledged their potential liability for exposure to asbestos-containing products (namely, internal gaskets and – where applicable – packing) that were included with their equipment at the time of sale so long as those exposures were a substantial contributing factor in the development of Mr. Coffman's mesothelioma. To argue otherwise would be inconsistent with settled law.

All of the equipment defendants except Crane Company adopted and incorporated this section of DeZurik's brief pursuant to Tenn. R. App. P. 27(j). Crane Company makes

---

[10] It is increasingly common to blur the distinction between negligence and strict liability claims in product liability actions, especially when those claims are based on a design defect or failure-to-warn theory of liability. *See, e.g.*, **Nye v. Bayer Cropscience, Inc.**, 347 S.W.3d 686, 701 (Tenn. 2011) ("Although [Restatement (Second) of Torts § 388] addresses a supplier's duty to warn under the law of negligence, courts also apply its principles to the duty to warn in strict liability."); **Whitehead v. Dycho Co.**, No. 47, 1987 WL 27044, at *4 (Tenn. Ct. App., filed Dec. 11, 1987), *rev'd on other grounds*, 775 S.W.2d 593 (Tenn. 1989) (stating that "the manufacturer's duty [to warn] is the same" in negligence and strict liability claims). *See generally* Rest. (Third) of Torts: Products Liability § 1, cmt. a; *id.* at § 2, cmt. n. Although we have serious concerns about this approach, the parties have not pressed the issue.

[11] Instead, the equipment defendants argue that plaintiffs presented insufficient evidence of causation with respect to these products.

- 22 -

substantially the same argument.

In order to put the duty-to-warn issue into sharper focus, we begin by considering the U.S. Supreme Court's recent decision in *Air & Liquid Systems Corporation et al. v. Devries, Individually and as Administratrix of the Estate of Devries, Deceased et al.*, 139 S. Ct. 986 (2019). In this maritime case, two Navy veterans were exposed to asbestos, developed cancer, and eventually died. *Id.* at 991. The veterans' families sued the manufacturers of the pumps, blowers, and turbines used on three Navy ships.[12] *Id.* According to the plaintiffs, asbestos-containing insulation and asbestos-containing parts were incorporated into, or used in connection with, the aforementioned equipment. *Id.* Sometimes the equipment was delivered to the Navy in "bare metal" form, which required the Navy to incorporate asbestos-containing parts post-sale; other times, "the equipment manufacturers themselves added the asbestos to the equipment." *Id.* at 991 n.1. The plaintiffs alleged that the equipment manufacturers "were negligent in failing to warn of the dangers of asbestos." *Id.*

The Court began its analysis by reciting "basic tort-law principles":

> Tort law imposes "a duty to exercise reasonable care" on those whose conduct presents a risk of harm to others. 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7, p. 77 (2005). For the manufacturer of a product, the general duty of care includes a duty to warn when the manufacturer "knows or has reason to know" that its product "is or is likely to be dangerous for the use for which it is supplied" and the manufacturer "has no reason to believe" that the product's users will realize that danger. 2 Restatement (Second) of Torts § 388, p. 301 (1963–1964).

*Id.* at 993. The Court proceeded to explain that

> [i]n tort cases, the federal and state courts have not reached consensus on how to apply that general tort-law "duty to warn" principle when the manufacturer's product requires later incorporation of a dangerous part in order for the integrated product to function as intended. Three approaches have emerged.
>
> The first approach is the more plaintiff-friendly foreseeability rule . . . . : A manufacturer may be liable when it was foreseeable that the manufacturer's product would be used

---

[12] One of the defendants, Ingersoll-Rand, is also a defendant in the present case.

- 23 -

with another product or part, even if the manufacturer's product did not require use or incorporation of that other product or part. *See, e.g.*, 873 F.3d at 240; **Kochera v. Foster Wheeler, LLC**, 2015 WL 5584749, *4 (S.D. Ill., Sept. 23, 2015); **Chicano v. General Elec. Co.**, 2004 WL 2250990, *9 (E.D. Pa., Oct. 5, 2004); **McKenzie v. A. W. Chesterson Co.**, 277 Ore. App. 728, 749–750, 373 P.3d 150, 162 (2016).

The second approach is the more defendant-friendly bare-metal defense that the manufacturers urge here: If a manufacturer did not itself make, sell, or distribute the part or incorporate the part into the product, the manufacturer is not liable for harm caused by the integrated product – even if the product required incorporation of the part and the manufacturer knew that the integrated product was likely to be dangerous for its intended uses. *See, e.g.*, **Lindstrom**, 424 F.3d at 492, 495–497; **Evans v. CBS Corp.**, 230 F. Supp. 3d 397, 403–405 (D. Del. 2017); **Cabasug v. Crane Co.**, 989 F. Supp. 2d 1027, 1041 (D. Haw. 2013).

The third approach falls between those two approaches. Under the third approach, foreseeability that the product may be used with another product or part that is likely to be dangerous is not enough to trigger a duty to warn. But a manufacturer does have a duty to warn when its product *requires* incorporation of a part and the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses. Under that approach, the manufacturer may be liable even when the manufacturer does not itself incorporate the required part into the product. *See, e.g.*, **Quirin v. Lorillard Tobacco Co.**, 17 F. Supp. 3d 760, 769–770 (N.D. Ill. 2014); **In re New York City Asbestos Litigation**, 27 N. Y. 3d 765, 793–794, 37 N.Y.S.3d 723, 59 N.E.3d 458, 474 (2016); **May v. Air & Liquid Systems Corp.**, 446 Md. 1, 29, 129 A.3d 984, 1000 (2015).

*Id.* at 993-94 (emphasis in original).

The Court declined to adopt the "mere foreseeability" approach because such an approach "would impose a difficult and costly burden on manufacturers, while simultaneously overwarning users." *Id.* at 994. The Court held that the bare metal defense "goes too far in the other direction." *Id.* The Court emphasized that a manufacturer already has a duty to warn when "the manufacturer 'knows or has reason to

know' that the product 'is or is likely to be dangerous for the use for which it is supplied.' " *Id.* (quoting 2 Rest. (Second) of Torts § 388 (1965)). According to the Court,

> the same holds true . . . when the manufacturer's product requires incorporation of a part that the manufacturer knows or has reason to know is likely to make the integrated product dangerous for its intended uses. As a matter of maritime tort law, we find no persuasive reason to distinguish those two similar situations for purposes of a manufacturer's duty to warn. *See* Restatement (Third) of Torts: Products Liability § 2, Comment i, p. 30 (1997) ("[W]arnings also may be needed to inform users and consumers of nonobvious and not generally known risks that unavoidably inhere in using or consuming the product").

*Id.*

Ultimately, the High Court adopted the "third approach," holding that:

> [i]n the maritime tort context, a product manufacturer has a duty to warn when (i) its product requires incorporation of a part, (ii) the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses, and (iii) the manufacturer has no reason to believe that the product's users will realize that danger.

*Id.* at 995. The Court clarified that the "third approach" also encompasses "certain related situations," such as when:

> (i) a manufacturer directs that the part be incorporated, *see, e.g.*, **Bell v. Foster Wheeler Energy Corp.**, 2016 WL 5780104, *6–*7 (E.D. La., Oct. 4, 2016); (ii) a manufacturer itself makes the product with a part that the manufacturer knows will require replacement with a similar part, *see, e.g.*, **Chesher v. 3M Co.**, 234 F. Supp. 3d 693, 713–714 (D. S.C. 2017); **Quirin**, 17 F. Supp. 3d at 769–770; **May**, 446 Md., at 29, 129 A.3d at 1000; or (iii) a product would be useless without the part, *see, e.g.*, **In re New York City Asbestos Litigation**, 27 N. Y. 3d, at 793–794, 37 N.Y.S.3d 723, 59 N.E.3d at 474.

*Id.* at 995-96. In these situations, "the product *in effect* requires the part in order for the integrated product to function as intended." *Id.* (emphasis added).

- 25 -

Justifying its decision, the Court explained that "the product manufacturer will often be in a better position than the parts manufacturer to warn of the danger from the integrated product." *Id.* at 994. This is because "[t]he product manufacturer knows the nature of the ultimate integrated product and is typically more aware of the risks associated with that integrated product." *Id.* In addition, because manufacturers *already* have a duty to warn of the dangers of their own products, the burden of providing additional warnings "should not meaningfully add to that burden." *Id.* at 994-95.

Three justices dissented. These justices would have adopted the bare metal defense. However, even the dissenting justices agreed that the defendants who purchased asbestos-containing components from other manufacturers and incorporated those components into their products pre-sale "had a duty to warn users about the known dangers of asbestos." *Id.* at 1000 n.5 (Gorsuch, J., dissenting). The dissenting justices also conceded that there is "a colorable argument" that the defendants' duty to warn "didn't end when the Navy, as part of routine upkeep, swapped out the original asbestos parts for replacements supplied by others." *Id.*

In the case now before us, the trial court ruled that the equipment defendants negated their alleged duty to warn about the post-sale integration of asbestos-containing insulation, flange gaskets, replacement internal gaskets, and replacement packing manufactured and sold by others. According to the court, the defendants successfully demonstrated that Tennessee is a "bare metal defense" jurisdiction. In reaching that conclusion, the court primarily relied on three federal cases interpreting Tennessee law: *Strayhorn v. Wyeth Pharm., Inc.*, 737 F.3d 378 (6th Cir. 2013), *Barnes v. Kerr, Corp.*, 418 F.3d 583 (6th Cir. 2005), and *Kellar v. Inductotherm Corp.*, 498 F. Supp. 172 (E.D. Tenn. 1978). The court also cited the Tennessee Supreme Court's decision in *Davis v. Komatsu America Indus. Corp.*, 42 S.W. 34 (Tenn. 2001).

In our view, the cases relied upon by the trial court do not support the conclusion that Tennessee is a "bare metal defense" jurisdiction.[13] In *Strayhorn*, the plaintiffs alleged that they "developed a serious neurological disorder" after ingesting metoclopramide, the generic equivalent of the prescription drug Reglan. 737 F.3d at 383. The plaintiffs sued the manufacturers of both drugs. *Id.* One theory of liability was that the manufacturer of Reglan "had an affirmative duty . . . to accurately label their products because a medical professional could foreseeably rely on that information in prescribing metoclopramide, the generic equivalent of Reglan." *Id.* at 401. The Sixth Circuit rejected this view:

---

[13] We also note that "[w]hen a federal court undertakes to decide a state law question in the absence of authoritative state precedent, the state courts are not bound to follow the federal court's decision." *Townes v. Sunbeam Oster Co., Inc.*, 50 S.W.3d 446, 452 (Tenn. Ct. App. 2001).

[W]e have no basis to conclude in this diversity case that the Tennessee Supreme Court would overrule its prior decisions holding that a manufacturer owes no duty of care to consumers of products made by others. Tennessee law instead "requires manufacturers to warn of hidden and unknown dangers in *their* product." *Pemberton v. Am. Distilled Spirits Co.*, 664 S.W.2d 690, 693 (Tenn. 1984) (emphasis added) (internal quotation marks omitted). Furthermore, "[d]rug manufacturers have a duty to exercise ordinary and reasonable care not to expose the public to an unreasonable risk of harm from the use of *their* products." *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 428 (Tenn.1994) (emphasis added). In Tennessee, a relationship exists between manufacturers and "those who foreseeably could be injured by the use of *their* products," not those persons injured by some other product. *See id.* (emphasis added).

*Id.* at 405.

First, *Strayhorn* is not an "incorporation case." In other words, the case did not involve the question of whether a manufacturer has a duty to warn when a dangerous product made by others is likely to be incorporated into, or used in connection with, the manufacturer's product post-sale. Second, the *Strayhorn* court's use of Tennessee case law is questionable. The court cites *Pittman* and *Pemberton* to support its conclusion that manufacturers never have a duty to warn of dangers associated with products manufactured by others. *Id.* The court selectively italicized words from those two opinions to make this point. However, *Pittman* and *Pemberton* are not incorporation cases. In fact, those cases did not even involve multiple products produced by different manufacturers. As we see it, *Strayhorn* does not establish that Tennessee is a bare metal defense jurisdiction.

In *Barnes*, a dentist sued the manufacturer of dental amalgams (also known as "silver fillings") after he allegedly developed mercury poisoning. 418 F.3d at 585. The amalgams manufactured by the defendant "consist[ed] of capsules of mercury and metal alloy, which the dentist combines by breaking a thin plastic wall separating the components, and then uses the amalgam as a filling." *Id.* at 585-86. Although the product contained "prominent warning labels" about the dangers of mercury, the plaintiff argued that the warnings were inadequate because "they stated the dangers of mercury alone, but not of mercury combined with the other ingredients of dental amalgams." *Id.* at 586, 591. The Sixth Circuit rejected that argument because (1) "the admonitory power of the warning would not be increased by a statement that mercury is also dangerous when used in conjunction with the other ingredients in dental amalgams"; and (2) because plaintiff "cited no Tennessee authority holding that a warning about a dangerous

- 27 -

ingredient in a product must affirmatively state that the particular ingredient remains dangerous when it is combined or is being combined with the other ingredients." *Id.* at 591. The court also stated:

> Although a product manufacturer generally has a duty to warn of the dangers of its own products, it does not have a duty to warn of the dangers of another manufacturer's products. . . . This is true even where a manufacturer has sufficient expertise to foresee the dangers of another company's products.

*Id.* at 590 (citing *Kellar v. Inductotherm Corp.*, 498 F. Supp. 172, 175 (E.D. Tenn. 1978)).

Although *Barnes* might be considered an "incorporation case" because it involves the combination of multiple ingredients, *Barnes* primarily involves the *inadequacy* of a warning on an admittedly dangerous product. Here, the equipment defendants are not arguing that their products were safe because they contained adequate warnings; instead, they dispute their alleged duty to warn altogether.

In *Kellar*, the plaintiff sued the manufacturer of a furnace and a rear deck that were purchased by the plaintiff's employer. 498 F. Supp. at 173. The plaintiff's employer placed the furnace into a pit and built a platform that surrounded the furnace. *Id.* at 174. The rear deck was attached to the furnace. *Id.* During the operation of the furnace, there were times when the rear deck did not completely cover the pit in which the furnace was installed. *Id.* One day, the plaintiff fell into the pit and injured himself. *Id.* The plaintiff argued that the furnace was defective and unreasonably dangerous because it was not designed with a guard for the pit. *Id.* The plaintiff also argued that the furnace was defective because the defendant failed to warn of the danger of the unguarded pit. *Id.*

The *Kellar* court rejected the plaintiff's arguments. The court emphasized that plaintiff's injury was caused by the dangerous pit and platform created by the plaintiff's employer, not the furnace or rear deck manufactured by the defendant. *Id.* It was in this context that the court said:

> If a manufacturer could be held liable for injury merely because it foresaw a danger created by another party, there would literally be no end of potential liability. To sustain such a theory would be to cast manufacturers into the role of insurers of products manufactured by others.

*Id.*

Importantly, the ***Kellar*** court noted that "[t]his is *not* a case in which a safe product arguably becomes dangerous because of the anticipated addition to it of other products."  ***Id.*** at 175 (emphasis added).  Finally, most of the court's analysis concerned the plaintiff's design defect claim, not the failure-to-warn claim.  The failure-to-warn claim was quickly dismissed because the dangerous condition of the pit was open and obvious.  ***Id.*** at 175 n.1, 176.  Here, of course, we are dealing with an allegation that "a safe product arguably becomes dangerous because of the anticipated addition to it of other parts."  Plaintiffs' claims are also based on the theory that defendants failed to warn of a non-obvious risk.

Although the trial court primarily relied on these federal cases in determining that the equipment defendants did not have a duty to warn, the court ruled that "[t]his is especially true under the 'component part doctrine' as recognized by the Tennessee Supreme Court."[14]  In ***Davis v. Komatsu America Industries Corporation***, the Tennessee Supreme Court adopted the component parts doctrine as articulated in Section 5 of the Restatement (Third) of Torts: Products Liability.  42 S.W.3d 34 (Tenn. 2001).  Under this doctrine,

> [o]ne engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
>
> (a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or
>
> (b)
> > (1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and
> >
> > (2) the integration of the component causes the product to be defective . . . ; and
> >
> > (3) the defect in the product causes the harm.

***Id.*** at 41 (quoting and adopting Section 5 of the *Restatement (Third) of Torts: Products Liability* (1997)).  According to the Tennessee Supreme Court, the component parts

---

[14] The trial court's discussion of the component parts doctrine only appears in the court's order granting summary judgment to Crane Company.

doctrine is sometimes called the "raw materials supplier defense" but "the principle is the same." *Id.* at 38 n.6 (citing *In re: TMJ Implants Products Liability Litigation*, 97 F.3d 1050, 1055, 1055 n.6 (8th Cir. 1996)). Some courts have also used the terms "component parts doctrine" and "bare metal defense" interchangeably. This makes sense only when the "raw materials" or "bare metal" products are the *components* of a final, integrated product. *See Bell v. Foster Wheeler Energy Corp.*, 2016 WL 5780104, at *7 n.17 (E.D. La., filed Oct. 4, 2016) (distinguishing between claims asserted against "a manufacturer of a bare metal component part that was used in conjunction with an asbestos product" and claims against a "component part manufacturer [that] does not make a bare metal product, but instead makes a component part containing asbestos").

The trial court determined that the products manufactured by the defendants were "components" of Eastman's larger piping system. Applying the component parts doctrine, the court determined that the equipment defendants were not liable because their products were not defective in themselves and there was no evidence that the defendants substantially participated in the integration of their products into the Eastman piping system.

The trial court mischaracterized the nature of this case. Plaintiffs are not alleging that the integration of defendants' valves, pumps, and steam traps caused *Eastman's piping system* to become defective; rather, plaintiffs are arguing that the integration of asbestos-containing insulation, gaskets, and packing into defendants' products caused *the defendants' products* to become defective. To paraphrase the plaintiffs, the asbestos-containing parts are the components and the defendants' valves, pumps, and steam traps are the final, integrated products. [15] Because plaintiffs are suing the manufacturers of the final, integrated products, the component parts doctrine is inapplicable. See *Bell*, 2016 WL 5780104, at *7 n.17.

Contrary to the decision of the trial court, there are no Tennessee cases that speak to the question of whether suppliers of industrial equipment have a duty to warn about dangers associated with the post-sale integration of dangerous component parts manufactured and supplied by others. We therefore approach this question of law as an issue of first impression.

At the outset, we note that our courts have sometimes suggested that in products liability cases a duty to warn only arises when a product is "in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." Tenn. Code Ann. § 29-28-105(a); *Goode v. Tamko Asphalt Products, Inc.*, 783 S.W.2d

---

[15] We are aware that the Restatement identifies valves as an example of a component part. *See* Rest. (Third) of Torts: Products Liability § 5, cmt. a. Ultimately, however, the factual context of a case determines whether a product is serving as a component part or the final, integrated product.

184, 187 (Tenn. 1989). This slightly mischaracterizes the issue. Section 105(a) of the TPLA substantially codified the common law rule set forth in the Restatement (Second) of Torts § 402A. *Shropshire v. American Tobacco Co., Div. of American Brands, Inc.*, 1988 WL 41018, at *1 (Tenn. Ct. App., filed Apr. 29, 1988), *perm. app. denied* (Tenn. 1988). Under that common law rule, a product could be considered "defective" if it did not contain appropriate warning labels. *See* Rest. (Second) of Torts § 402A, cmt. h. ("Where . . . [a supplier] has reason to anticipate that danger may result from a particular use [of a product], . . . [the supplier] may be required to give adequate warning of the danger . . . and a product sold without such warning is in a defective condition."); *see also* Rest. (Third) of Torts: Products Liability § 2(c). This, of course, requires a threshold determination that a common law duty to warn existed. *See Bissinger v. New Country Buffet*, No. M2011–02183–COA–R9–C, 2014 WL 2568413, at *19 (Tenn. Ct. App., filed June 6, 2014) (approvingly quoting a trial court's observation that "there [is] 'no statutory duty to warn under the Tennessee regulatory scheme,' . . . the issue is whether there is a common law duty."). Therefore, despite some authority to the contrary, we begin our analysis by determining whether the equipment defendants had a duty to warn about the post-sale integration of asbestos-containing products manufactured and sold by others.

In *Satterfield v. Breeding Insulation Company*, the Tennessee Supreme Court set forth a detailed method for determining the existence and scope of a person's duty of care.[16] The Court explained that "[d]uty is a legal obligation to conform to a reasonable person standard of care in order to protect others against unreasonable risks of harm." 266 S.W.3d 347, 355 (Tenn. 2008). Generally, persons have a duty to refrain from engaging in acts of "misfeasance" – affirmative acts that create "an unreasonable and foreseeable risk of harm to persons or property." *Id.* at 362 (citing *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). On the other hand, persons generally do *not* have a duty to protect persons from harm caused by others unless "certain special relationships exist between the defendant and either the person who is the source of the danger or the person who is foreseeably at risk from the danger." *Id.* at 359 (citations omitted). A defendant's failure to protect persons from harm caused by others is called "nonfeasance." *Id.* at 355-56.

A defendant's failure to warn can be classified as nonfeasance when the defendant was not the source of the danger. *See, e.g.*, *Bradshaw v. Daniel*, 854 S.W.2d 865 (Tenn. 1993). On the other hand, a defendant's failure to warn can be considered misfeasance if the defendant was the source of the danger or otherwise engaged in conduct that created "an unreasonable and foreseeable risk of harm to persons or property." *See Satterfield*, 266 S.W.3d at 362 (emphasis added) (citing *McCall v. Wilder*, 913 S.W.2d 150, 153

---

[16] Defendants argue that *Satterfield* only applies in premises liability cases. The *Satterfield* Court stated just the opposite: "[T]his opinion is not addressed to premises liability law but rather to the law applicable in a general negligence misfeasance case." 266 S.W.3d 347, 371 (Tenn. 2008).

(Tenn. 1995)). Here, plaintiffs allege that the equipment defendants created "an unreasonable and foreseeable risk of harm" by manufacturing and selling equipment that was likely (and intended) to be used with asbestos and which did not contain warning labels about asbestos. This is an allegation of misfeasance.

The *Satterfield* Court established the following test for determining the existence and scope of a duty of care in negligence cases involving alleged misfeasance:

> When the existence of a particular duty is not a given or when the rules of the established precedents are not readily applicable, courts will turn to public policy for guidance. Doing so necessarily favors imposing a duty of reasonable care where a "defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property." When conducting this analysis, the courts have considered, among other factors: (1) the foreseeable probability of the harm or injury occurring; (2) the possible magnitude of the potential harm or injury; (3) the importance or social value of the activity engaged in by the defendant; (4) the usefulness of the conduct to the defendant; (5) the feasibility of alternative conduct that is safer; (6) the relative costs and burdens associated with that safer conduct; (7) the relative usefulness of the safer conduct; and (8) the relative safety of alternative conduct.
>
> With these factors firmly in mind, Tennessee's courts use a balancing approach to determine whether the particular risk should give rise to a duty of reasonable care. A duty arises when the degree of foreseeability of the risk and the gravity of the harm outweigh the burden that would be imposed if the defendant were required to engage in an alternative course of conduct that would have prevented the harm.
>
> \*   \*   \*
>
> While every balancing factor is significant, the foreseeability factor has taken on paramount importance in Tennessee. This factor is so important that if an injury could not have been reasonably foreseen, a duty does not arise even if causation-in-fact has been established. Conversely, foreseeability alone is insufficient to create a duty. Thus, to prevail on a

- 32 -

negligence claim, a plaintiff must show that the risk was foreseeable, but that showing is not, in and of itself, sufficient to create a duty. Instead, if a risk is foreseeable, courts then undertake the balancing analysis.

*Id.* at 365-66 (internal citations and footnotes omitted).

Because foreseeability of harm is central to the *Satterfield* duty analysis, the bare metal defense is clearly inconsistent with Tennessee law. As the trial court noted, the bare metal defense shields a defendant from liability with respect to products manufactured and sold by others *even if it is foreseeable* that those products will be incorporated into, or used in connection with, the defendant's product post-sale. It is equally clear, however, that the "mere foreseeability" approach followed by some states is inconsistent with *Satterfield*. 266 S.W.3d at 366 ("[A] plaintiff must show that the risk was foreseeable, but that showing is not, in and of itself, sufficient to create a duty."). The U.S. Supreme Court's "third approach" is not consistent with the *Satterfield* analysis either.[17] Focusing on whether the later incorporation of a dangerous product was "required" or "in effect required" collapses the *Satterfield* foreseeability analysis and balancing test into one step. This approach also does not adequately take into account one of the most important factors of the *Satterfield* balancing test – "the gravity of the harm" posed by a defendant's conduct.

The *Satterfield* duty analysis has been subject to enduring criticism. *See, e.g.*, *Satterfield*, 266 S.W.3d at 375-79 (Holder, J., dissenting). In some cases, it has proven difficult to apply. *See, e.g.*, *Stockton v. Ford Motor Company*, No. W2016–01175–COA–R3–CV, 2017 WL 2021760, at *12-15 (Tenn. Ct. App., filed May 12, 2017); *Marla H. v. Knox County*, 361 S.W.3d 518, 532 n.15 (Tenn. Ct. App. 2011). However, "it is simply not our place to disregard binding precedent set forth by our supreme court." *Stockton*, 2017 WL 2021760, at *19 (Stafford, J., dissenting).

We now apply *Satterfield* to the facts of this case. First, *Satterfield* requires us to decide whether plaintiffs submitted evidence that it was reasonably foreseeable that the equipment defendants' conduct would create "a recognizable risk of harm to [Mr. Coffman] individually, or to a class of persons . . . of which [Mr. Coffman] is a member."[18] *Id.* at 367. Plaintiffs argue that asbestos exposure from the post-sale

---

[17] We are not required to apply the U.S. Supreme Court's "third approach," because the Court expressly limited its holding to the "maritime tort context." *Air and Liquid Sys. Corp.*, 139 S. Ct. at 991.

[18] This foreseeability analysis is consistent with the TPLA. The TPLA limits suppliers' liability to products that are "in a defective condition or unreasonably dangerous at the time [they] left the control of the manufacturer or seller." Tenn. Code Ann. § 29-28-105(a) (emphasis added). The TPLA defines "defective condition" as a product that is "unsafe for normal or *anticipatable* handling and consumption." *Id.* at § 29-28-102(2) (emphasis added). The TPLA also provides that "[i]f a product is not unreasonably

- 33 -

integration of insulation, flange gaskets, replacement internal gaskets, and replacement packing was foreseeable by pointing to evidence that the defendants themselves incorporated asbestos parts into some of their equipment pre-sale, sold asbestos materials for use with their equipment, and specified that asbestos replacement materials should be used with their equipment. This evidence was introduced in the form of corporate documents (e.g., material specification lists, product catalogues, repair manuals, etc.) as well as testimony from corporate representatives.[19]

Plaintiffs also rely on the affidavit of an expert witness, Frank Parker, who is a certified industrial hygienist. Based on his knowledge of the defendants' equipment and relevant industry practices, Mr. Parker testified that it was "reasonably foreseeable" that: (1) "flanged equipment would need flange gaskets to prevent the equipment from leaking once installed"; (2) "gaskets deteriorate over time and would need to be replaced"; (3) "replacement asbestos gaskets and packing would very likely be used in the equipment"; (4) "after installation, they would likely be insulated for safety and/or heat retention"; and (5) "asbestos containing thermal insulation products . . . were available and commonly used within industry prior to World War II and well into the 1970's." Based on this evidence, we agree with plaintiffs that it was foreseeable for mechanics like Mr. Coffman to be exposed to asbestos-containing insulation, flange gaskets, replacement internal gaskets, and replacement packing supplied by others post-sale.[20]

As previously discussed, "foreseeability alone is insufficient to create a duty. . . . Instead, if a risk is foreseeable, courts then undertake the balancing analysis." *Satterfield*, 266 S.W.3d at 366. The *Satterfield* balancing test requires consideration of the following factors:

> (1) the foreseeable probability of the harm or injury occurring; (2) the possible magnitude of the potential harm or injury; (3) the importance or social value of the activity engaged in by the defendant; (4) the usefulness of the conduct

---

dangerous at the time it leaves the control of the manufacturer or seller but was made unreasonably dangerous by subsequent *unforeseeable* alteration, change, improper maintenance or abnormal use, the manufacturer or seller is not liable." *Id.* at § 29-28-108 (emphasis added).

[19] Fisher challenges the admissibility of plaintiffs' evidence that Fisher directed the use of asbestos with its products. Because this argument was raised for the first time on appeal, we deem the argument waived. Fisher also argues that the evidence cited by plaintiffs does not support the conclusion that Fisher specified the use of asbestos with its products. Fisher argues that its "material specifications" lists were merely for "internal" use. Fisher also insists that it merely supplied asbestos parts when its *customers* specified their need for them. We see no meaningful difference and therefore reject Fisher's narrow interpretation of the evidence.

[20] As we explain in the next section of this opinion, the trial court abused its discretion by excluding the testimony of Mr. Parker.

to the defendant; (5) the feasibility of alternative conduct that is safer; (6) the relative costs and burdens associated with that safer conduct; (7) the relative usefulness of the safer conduct; and (8) the relative safety of alternative conduct.

*Id.* at 365. We have already discussed the foreseeability factor at length. That factor clearly weighs in favor of imposing a duty to warn. "In light of the debilitating and fatal illnesses that can be caused by exposure to asbestos fibers, the magnitude of the potential harm [to plaintiff] was great." *See id.* at 368. Thus, the second factor also weighs in favor of imposing a duty to warn. The third and fourth factors concern the social value and usefulness of the defendants' conduct. Clearly, the defendants were engaged in the exchange of goods. Economic activity is generally beneficial to society. Factors five and six concern the feasibility of alternative conduct and the relative costs and burdens associated with alternative conduct. As the U.S. Supreme Court observed in *Air & Liquid Systems Corporation*, "issuing a warning costs time and money. But the burden usually is not significant." 139 S. Ct. at 994. Moreover, "[m]anufacturers already have a duty to warn of the dangers of their own products." *Id.* at 994-95. The last two factors relate to the relative safety and usefulness of alternative conduct. In the present case, Mr. Coffman testified that he would have sought out protective gear if he had seen a warning label on the defendants' equipment. Defendants did not refute that testimony. Accordingly, the last two factors of the balancing test also favor imposing a duty to warn.

As previously mentioned, the *Satterfield* balancing test is conducted for the purpose of determining whether "the degree of foreseeability of the risk and the gravity of the harm outweigh the burden that would be imposed if the defendant were required to engage in an alternative course of conduct that would have prevented the harm." *Satterfield*, 266 S.W.3d at 365. In the present case, it was *extremely* foreseeable that asbestos-containing insulation, flange gaskets, replacement internal gaskets, and replacement packing would be applied to the defendants' equipment post-sale. The Supreme Court has also noted that asbestos "is an *extremely* dangerous substance and that unprotected exposure to respirable asbestos fibers over a period of time may well result in death." *Nye*, 347 S.W.3d at 704 (emphasis added). "Given the highly hazardous nature of asbestos [and] the dire consequences to the unwarned consumer," the "possible magnitude of the potential harm" was great. *Satterfield*, 266 S.W.3d at 365; *Nye*, 347 S.W.3d at 704. In our view, the degree of foreseeable harm and the gravity of potential harm outweighed the burden that the equipment defendants would have suffered by warning about the post-sale integration of asbestos-containing insulation, flange gaskets, internal replacement gaskets, and replacement packing. Accordingly, the equipment defendants *did* have a duty to warn about the dangers associated with those later-added products. The trial court erred by granting summary judgment to the equipment defendants on the ground that they negated their alleged duty to warn.

**D.**

The last issue presented in this case is whether the trial court erred by granting summary judgment to Armstrong, Crane Company, DeZurik, Fisher, Jamesbury, Jerguson, and John Crane on the ground that plaintiffs presented insufficient evidence of causation.[21]  For the reasons discussed below, we hold that plaintiffs successfully raised genuine issues of fact as to whether Mr. Coffman's mesothelioma was caused by his exposure to:  (1) John Crane packing; (2) internal gaskets incorporated into Armstrong steam traps pre-sale; and (3) asbestos-containing insulation, gaskets, and packing that were manufactured and sold by Johns-Manville and incorporated into defendants' equipment post-sale.  Accordingly, we vacate the court's orders granting summary judgment to each of the defendants on this ground.

To survive summary judgment, plaintiffs were required to submit evidence that could lead a jury to reasonably conclude that each of the defendants' products was a "cause in fact" as well as a "proximate cause" of Mr. Coffman's development of mesothelioma.  *Nye*, 347 S.W.3d at 704.  "Cause in fact or 'actual cause' means 'that the injury or harm would not have occurred 'but-for' the defendant's negligent conduct.' " *King v. Anderson Co.*, 419 S.W.3d 232, 246 (Tenn. 2013) (quoting *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993)).  "It is not necessary that the defendants' act be the *sole* cause of the plaintiff's injury, only that it be *a* cause."  *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005) (emphasis in original).  "Proximate or legal cause is a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct[.]" *Nye*, 347 S.W.3d at 705.  To prove proximate causation, a plaintiff must show that

> (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*Wilson v. Americare Sys., Inc.*, 397 S.W.3d 552, 558 (Tenn. 2013) (citing *Hale*, 166

---

[21] In a footnote, plaintiffs argue that the trial court did *not* grant these seven defendants summary judgment on the ground of insufficient evidence of causation.  We disagree.  The court *clearly* granted these defendants summary judgment on the issue of causation.  Later, the court entered an order denying plaintiffs' motion to designate John Crane's summary judgment order as a final judgment.  In that order, the court suggested it did *not* grant other defendants summary judgment because of plaintiffs' insufficient evidence of causation.  However, the court's previous orders were certified as final judgments; accordingly, they were not subject to revision.

S.W.3d at 719).

"Where the evidence supports more than one reasonable conclusion, causation in fact and proximate causation are issues of fact which should be decided by the jury and not the appellate court." *Id.* at 559. At the summary judgment stage, the nonmoving party may raise a genuine issue of material fact by relying on "direct evidence, circumstantial evidence, or a combination of both." *Hindman v. Doe*, 241 S.W.3d 464, 468 (Tenn. Ct. App. 2007) (citations omitted). "Both types of evidence can be equally relevant . . . and equally probative[.]" *Id.* (citations omitted). However, "the nonmoving party must do 'something more than simply show that there is some metaphysical doubt as to the material facts.' " *Rye*, 477 S.W.3d at 265 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

First, we will consider plaintiffs' evidence of actual causation with respect to John Crane. Second, we will consider plaintiffs' evidence of actual causation with respect to the six equipment defendants. Third, we will turn our attention to proximate causation.

**1.**

Mr. Coffman identified John Crane as one of the four manufacturers of packing that he encountered at Eastman. Plaintiffs allege that Mr. Coffman was exposed to asbestos dust during the removal of John Crane packing from various pieces of equipment. The trial court ruled that plaintiffs presented insufficient evidence that Mr. Coffman's exposure to John Crane packing was an actual cause of his development of mesothelioma. Specifically, the court determined that plaintiffs presented insufficient evidence that the John Crane packing at Eastman actually contained asbestos.

It is undisputed that John Crane sold packing that contained asbestos. John Crane also sold packing that did not contain asbestos. Both types of packing were advertised for use in corrosive, high-heat environments. Mr. Coffman did not have direct knowledge that the John Crane packing at Eastman contained asbestos; he could only state that the packing was gray and charcoal-colored. If this were the only evidence introduced by plaintiffs, we would agree with John Crane that the evidence merely introduced "some metaphysical doubt" about whether the John Crane packing at Eastman contained asbestos. Critically, however, a corporate representative of John Crane testified that "[m]ost of the nonasbestos products were more expensive, and a lot of the firms didn't want to use them." A jury could reasonably infer from this testimony that Eastman purchased John Crane's asbestos-containing packing because it was less expensive. Accordingly, we conclude that there is sufficient circumstantial evidence in the record to create a genuine issue of fact as to whether the John Crane packing at Eastman contained asbestos and contributed to Mr. Coffman's development of mesothelioma. The trial court erred in concluding otherwise.

**2.**

We now consider whether plaintiffs presented sufficient evidence of actual causation with respect to equipment sold by Armstrong, Crane Company, DeZurik, Fisher, Jamesbury, and Jerguson.

We hold that plaintiffs presented sufficient evidence that Mr. Coffman was exposed to insulation, flange gaskets, replacement internal gaskets, and replacement packing sold by others and used with defendants' equipment post-sale. According to the trial court, "[i]t is *undisputed* that Donald Coffman was exposed to asbestos-containing products, including insulation, gaskets, and packing, that were manufactured, distributed or sold by Johns-Manville Corporation." (Emphasis added.) Apparently, the court did not consider this evidence relevant to the causation analysis because the court had already determined that the equipment defendants did not have a duty to warn about products manufactured and sold by others. However, as we explained earlier in this opinion, the equipment defendants *did* have a duty to warn about the post-sale integration of asbestos-containing insulation, flange gaskets, replacement internal gaskets, and replacement packing manufactured and sold by others. Because it is undisputed that Mr. Coffman was exposed to asbestos while removing Johns-Manville insulation, gaskets, and packing from equipment at Eastman, we hold that plaintiffs successfully raised a question of fact as to whether that equipment contributed to Mr. Coffman's development of mesothelioma. The trial court erred by concluding otherwise.

We also hold that plaintiffs successfully raised an issue of fact as to whether Mr. Coffman was exposed to asbestos during the removal of original gaskets in Armstrong steam traps. The trial court ruled that Armstrong "does not appear to dispute that its steam traps at Eastman probably had original internal asbestos-containing gaskets." Although Mr. Coffman did not know whether the specific gaskets that he removed were originals or replacements, he testified that Armstrong steam traps were replaced "at least twice a week." Naturally, this would increase the probability that Mr. Coffman encountered original asbestos-containing gaskets. Given the length of Mr. Coffman's career at Eastman and the frequent installation of new Armstrong steam traps, a jury could reasonably infer that Mr. Coffman was, in fact, exposed to asbestos during the removal of internal gaskets incorporated into Armstrong steam traps pre-sale. Consequently, the trial court erred by concluding that plaintiffs presented insufficient evidence that Mr. Coffman's exposure to the original asbestos-containing gaskets in Armstrong steam traps was an actual cause of his disease.

To summarize, we conclude that plaintiffs raised genuine issues of material fact as to whether Mr. Coffman's development of mesothelioma was caused by his exposure to: (1) John Crane packing; (2) internal gaskets incorporated into Armstrong steam traps pre-sale; and (3) insulation, flange gaskets, internal replacement gaskets, and replacement packing used in connection with defendants' equipment post-sale.

**3.**

Turning to proximate causation, we will now consider whether the court erred by determining that plaintiffs presented insufficient evidence that Mr. Coffman's exposure to defendants' products *substantially contributed* to his development of mesothelioma.[22] Plaintiffs argue that the expert testimony of Mr. Parker and Dr. Maddox creates a question of fact on this issue. Mr. Parker is a certified industrial hygienist. Based on his review of Mr. Coffman's deposition testimony, Mr. Parker testified that

> a) Mr. Coffman and probably most if not all the workers working in Mr. Coffman's work area at the Tennessee Eastman plant were routinely exposed to significant airborne concentrations of respirable asbestos fibers;
>
> b) These exposure concentrations most likely frequently exceeded any contemporary occupational exposure standard;
>
> c) Mr. Coffman was occupationally exposed to asbestos directly and as a bystander;
>
> d) Mr. Coffman's direct and bystander asbestos exposures to the asbestos containing materials on (insulation) and incorporated into the pumps, valves, and steam trap (gaskets and packing), and packing brand itself identified above, as well as his exposure to insulation dust created by Daniel personnel, were each a significant source of Mr. Coffman's asbestos exposures; and
>
> e) Mr. Coffman's exposures to asbestos released from each of these equipment, products, and the contractor Daniel increased his dose, which in turn significantly increased his risk of contracting an asbestos related disease such as mesothelioma.

Dr. Maddox is a pathologist. He testified as follows:

> [I]t is my personal and professional opinion, within

---

[22] Defendants do not appear to dispute the applicability of the other two elements of proximate causation: the absence of a "rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm" and "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." *See* **Wilson**, 397 S.W.3d at 558.

reasonable medical probability, that Mr. Coffman suffered from malignant mesothelioma that was caused by his cumulative exposure to asbestos dust. With reasonable medical probability, all of the component exposures that were clearly above normal background levels, repetitive, and within a 10 year latency period, as discussed by Frank Parker, CIH, in his report and in Mr. Coffman's testimony, contributed to cause his malignant mesothelioma. It is my opinion that, within a reasonable degree of medical probability, Mr. Coffman's exposure to asbestos dust from gaskets, packing, and thermal system insulation were substantial factors in causing Mr. Coffman's malignant mesothelioma.

The trial court disregarded the testimony of Mr. Parker and Dr. Maddox because the court determined that their affidavits were untimely and inadmissible in evidence. We review the trial court's decision for abuse of discretion. *Shipley v. Williams*, 350 S.W.3d 527, 552 (Tenn. 2011); *Bowman v. Bennouttas*, 519 S.W.3d 586, 603 (Tenn. Ct. App. 2016).

It is undisputed that plaintiffs identified their expert witnesses and filed expert reports prior to the deadline established in the court's scheduling order. The testimony disregarded by the trial court appears in *supplemental* affidavits submitted in response to defendants' motions for summary judgment. "A party is under a *duty* seasonably to supplement the party's [discovery] response with respect to . . . the identity of each person expected to be called as an expert witness at trial, *the subject matter on which the person is expected to testify, and the substance of that testimony*." Tenn. R. Civ. P. 26.05 (emphasis added); *see also Waters v. Coker*, No. M2007-01867-COA-RM-CV, 2008 WL 4072104, at *6 (Tenn. Ct. App., filed Aug. 28, 2008) ("The fact that an expert witness who has responded to a request for discovery subsequently changes the substance of that testimony during the course of litigation is not uncommon."). The trial court abused its discretion when it disregarded the experts' testimony because plaintiffs had a duty under the rules of civil procedure to file supplemental affidavits if Mr. Parker or Dr. Maddox intended to change "the subject matter on which [they were] expected to testify" or "the substance of that testimony." Tenn. R. Civ. P. 26.05. In any event, defendants cannot argue that they were "surprised" by the testimony contained in the experts' supplemental affidavits because their affidavits were filed months prior to the summary judgment hearing.

The court also disregarded the experts' testimony because the court determined that their testimony "lacked sufficient foundation." According to the court, the experts' testimony was "conclusory" and "speculative" because the experts did not "examine the relevant job site or various products through which Mr. Coffman was allegedly exposed

to asbestos." The court also noted that the experts did not "conduct any exposure calculations." Instead, plaintiffs' experts based their opinions on the deposition testimony of Mr. Coffman and Mr. Frasier. Dr. Maddox also based his opinion, in part, on Mr. Parker's expert report.

We conclude that the trial court abused its discretion because it applied an incorrect legal standard in excluding the testimony of plaintiffs' experts. Expert opinion testimony is generally admissible if it "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue[.]" Tenn. R. Evid. 702. In asbestos-exposure cases,

> experts [are] not required to establish "a dose exposure above a certain amount" before they c[an] testify about causation. *So long as a qualified expert can offer an opinion, based upon reliable data, that will substantially assist the trier of fact, the expert's testimony should be permitted.*

***Payne v. CSX Transp., Inc.***, 467 S.W.3d 413, 457 (Tenn. 2015) (emphasis added) (footnote omitted) (citing Tenn. R. Evid. 702 & 703).

Experts may not testify "in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703. However, experts do not have to base their opinions on firsthand knowledge. *See id.* ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by *or made known to the expert at or before the hearing.*") (emphasis added); ***Daubert v. Merrell Dow Pharm., Inc.***, 509 U.S. 579, 592 (1993) ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."); ***Shipley***, 350 S.W.3d at 553 (holding that expert testimony in a medical malpractice case does not require firsthand knowledge). Experts may even give their opinion in response to a hypothetical question as long as "the question contained enough facts, supported by evidence, to permit an expert to give a reasonable opinion which is not based on mere speculation or conjecture and which is not misleading to a trier of fact." ***Pentecost v. Anchor Wire Corp.***, 662 S.W.2d 327, 329 (Tenn. 1983).

> When the evidence is conflicting concerning the existence of the assumed facts material to the expert's opinion, counsel propounding the hypothetical is obviously entitled to include as an assumed fact his version of the evidence on the disputed fact. It is then for the jury to resolve the factual dispute and, depending upon its findings, determine what weight, if any, to give the opinion elicited by the hypothetical.

***Tolliver v. Tripp***, No. 311, 1990 WL 140917, at *3 (Tenn. Ct. App., filed Oct. 1, 1990)

- 41 -

(citing *Pentecost*, 662 S.W.2d at 329).

Mr. Parker's testimony is admissible because he was not required to have firsthand knowledge of the Eastman facility or the products to which Mr. Coffman was exposed in order to give his expert opinion on the seriousness of Mr. Coffman's cumulative exposure to asbestos. He was entitled to rely on the deposition of Mr. Coffman and Mr. Frasier to develop an opinion on the matter. Dr. Maddox's expert opinion is admissible because it essentially responds to the following hypothetical question: If Mr. Coffman was exposed to asbestos-containing products as often as he says he was, then was Mr. Coffman's exposure to those products a substantial contributing factor to the development of his disease? "It is . . . for the jury to . . . determine what weight, if any, to give the opinion elicited by the hypothetical." *See Tolliver*, 1990 WL 140917, at *3.

For the foregoing reasons, we conclude that the trial court abused its discretion when it disregarded the testimony of plaintiffs' expert witnesses. We also hold that the experts' testimony was sufficient to raise a question of fact as to whether each of the defendants' products was a substantial contributing factor (and a proximate cause) of Mr. Coffman's development of mesothelioma.

To conclude our discussion of this ground for summary judgment, we reiterate that plaintiffs presented sufficient evidence of actual causation with respect to: (1) John Crane packing; (2) internal gaskets incorporated into Armstrong steam traps pre-sale; and (3) insulation, flange gaskets, internal replacement gaskets, and replacement packing used in connection with defendants' equipment post-sale. Plaintiffs also introduced admissible expert testimony that raised genuine issues of material fact as to proximate causation. Accordingly, the trial court erred when it granted summary judgment to John Crane and six of the equipment defendants on the ground that plaintiffs presented insufficient evidence of causation.

## V.

We vacate all of the final judgments entered by the trial court. The case is remanded for further proceedings consistent with this opinion. Costs on appeal are taxed to the appellees, Armstrong, Crane Company, Daniel, DeZurik, Fisher, Flowserve, Ingersoll-Rand, Jamesbury, Jerguson, John Crane, and Powell.

_____
CHARLES D. SUSANO, JR., JUDGE